UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NATIONAL INTEGRATED GROUP PENSION PLAN, et al., | Civ. No. 2:11-5072 (KM) |
| Plaintiffs, | OPINION |
| v. | |
| BLACK MILLWORK COMPANY, INC., | |
| Defendant. | |

**KEVIN MCNULTY, U.S.D.J.:**

In 1971, Defendant Black Millwork Company, Inc. ("Black Millwork") began making pension contributions on behalf of its covered employees to the National Integrated Group Pension Plan ("NIGPP"), the plaintiff in this action.[1] Nearly forty years later, after losing its biggest supplier and most of its revenue, Black Millwork withdrew from the NIGPP. By doing so, contends NIGPP, Black Millwork incurred over $5 million in withdrawal liability pursuant to the Employee Retirement Income Security Act ("ERISA").[2] That withdrawal liability, representing Black Millwork's share of the NIGPP's unfunded, vested benefits, is payable in eighty quarterly instalments. Black Millwork made the first payment in August 2010, but has made no others, and has submitted the issue of its liability to arbitration.

NIGPP has moved for summary judgment, arguing that the facts are not in dispute and that ERISA requires Black Millwork to make these interim withdrawal liability payments. Black Millwork responds that those payments would bankrupt the Company, and that it should be excused under an equitable exception that has been recognized by the Fifth and Seventh Circuits.

---

[1] For simplicity's sake, I refer to the plaintiffs, NIGPP and its Board of Trustees, collectively as NIGPP.

[2] Technically, the issues here turn largely on certain amendments contained in the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). For simplicity, I refer to the statute generically as "ERISA."

Third Circuit case law is clear that interim withdrawal liability payments are mandatory, even when arbitration is pending. And the equitable exception cited by Black Millwork, even if it were recognized in this Circuit, would not apply under the circumstances of this case. Accordingly, NIGPP's motion for summary judgment is granted.

## I. FACTS & PROCEDURAL HISTORY[3]

### A. Black Millwork's Employee Pension Plan

The NIGPP is a multi-employer defined benefit plan that receives contributions from employers and pays vested benefits to participants. (NIGPP's Statement of Material Facts ("SMF") [Docket No. 34-3], ¶ 2, Ex. B). Pursuant to the NIGPP Plan Document, the Board of the NIGPP employed an Administrative Agency to administer the NIGPP. (*Id.* ¶ 8, Ex. A).

As of January 1, 1971, Black Millwork[4] signed a Participation Agreement with NIGPP in which it undertook to make specific contributions on behalf of certain covered, unionized employees. In doing so, Black Millwork agreed to accept "the terms and provisions of the Trust Agreement" and to be

> bound by the acts and determinations of the Board [of Trustees under the Trust Agreement], including, without limitation, the establishment, maintenance, modification and termination of the [Plan] as provided in the Trust Agreement, i[t] being understood that no provision of this Participation Agreement shall alter the express provision of the Trust Agreement that no action may be taken by the Board which would impose any liability on [Black Millwork] other than the timely payments to the Trust Fund of

---

[3] Pursuant to L. Civ. R. 56.1, NIGPP submitted a statement of material facts believed to be undisputed. Black Millwork filed a response that denies certain facts, but fails to cite to any affidavit or document in support, as Local Rule 56.1 requires. I would be justified in treating such defectively-denied facts as undisputed, see Fed. R. Civ. P. 56(e)(2), (3), but I need not do so here because Black Millwork does not raise any genuine issue that is truly material to the appropriateness, or not, of mandatory interim withdrawal liability payments – the only issue at stake here. Black Millwork does not really contest, for instance, that it made payments to the Plan, that the Plan is governed by ERISA, or that its withdrawal from the Plan triggered NIGPP's determination that the Company owed withdrawal liability for doing so.

[4] At that time, Black Millwork was known as Black Millwork & Lumber Company, Inc. (Ex. B to SMF).

2

such contributions as are specified in the Pension Agreement or specified by the Board in its acceptance of this Participation Agreement, or any supplement . . . thereof.

(*Id.*).

Over the years, Black Millwork signed Supplemental Participation Agreements. (SMF ¶ 5). The most recent was dated January 15, 2007. (Ex. C to SMF). It provided that "the parties to this Supplement remain bound by all requirements in their Participation Agreement." (*Id.*). It goes on to state:

> The terms set forth in this Supplement and in the Board's Certification of Acceptance of this Supplement shall define the Participating Employer's Contribution obligations to the Plan. Therefore, any term in the Pension Agreement/Collective Bargaining Agreement that is contrary to a term set forth in this Supplement, or in the Board's Certification of Acceptance of this Supplement, or that is otherwise contrary to the rules of the Plan, shall be of no force and effect unless approved by the Board . . . .

(*Id.*).

From January 1, 1971 to January 31, 2010, Black Millwork participated in the Plan and made regular contributions. As a result, its covered employees accumulated vested benefits. (SMF ¶ 7).

### B. Black Millwork Withdraws from the NIGPP

In January 2010, the relationship between Black Millwork and its biggest supplier, Andersen Windows, ceased. (Hoffman[5] Decl. ¶ 2 [Docket No. 35-2]). As a result, Black Millwork's sales volume shrank drastically, from $180 million in the fiscal year ending January 1, 2010, to $4 million in the following fiscal year. (*Id.* ¶ 4). Through the eight months preceding September 30, 2010, the Company had negative working capital and a net loss of about $2.5 million. (*Id.*). Despite this setback, for the fiscal year ending January 1, 2013, the Company projected profitability to be slightly negative, with a chance at breaking even. (*Id.* ¶ 17).

As a result of those financial reverses, Black Millwork decided it could not afford the quarterly payments to NIGPP. (*Id.* ¶ 5). Accordingly, on May 10,

---

[5] Kevin Hoffman is the president of Black Millwork.

2010, Black Millwork notified the NIGPP Administrative Agency that, effective retroactively as of January 31, 2010, it would no longer participate in the Plan. (SMF ¶ 9).

The NIGPP Administrative Agency determined that this constituted a "complete withdrawal" from the Plan within the meaning of ERISA, 29 U.S.C. § 1383(a). (SMF ¶ 10). ERISA provides that if an employer completely withdraws from a multiemployer plan, "then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a). In general, the "withdrawal liability" will equal the amount of benefits that are vested, but unfunded, at the time of withdrawal.

Working with the Plan's actuaries, the NIGPP Administrative Agency determined that Black Millwork had incurred an estimated withdrawal liability of $5,215,128, to be paid in 80 quarterly instalments of $64,466.85.[6] (SMF ¶ 12). In a letter dated July 13, 2010, NIGPP informed Black Millwork of this determination and demanded the first payment within thirty days, with subsequent quarterly payments to begin on January 1, 2011. (Id.).

On August 11, 2010, Black Millwork paid the first instalment. (Id. ¶ 13). In a letter dated November 17, 2010, however, Black Millwork notified NIGPP and the American Arbitration Association (the "AAA") that, pursuant to Section 4221 of ERISA, 29 U.S.C. § 1401(a), and in accordance with the AAA Multi-Employer Pension Plan Arbitration Rules, it was initiating arbitration to challenge the NIGPP's withdrawal liability assessment. (SMF ¶ 18). In response to the Court's request for an update, NIGP recently wrote that the parties have a conference scheduled with the arbitrator for August 26, 2013, but a hearing date has not yet been set. (Id. ¶¶ 19-20, July 26, 2013 Update Letter from NIGPP [Docket No. 39]).

Black Millwork has made no further payments of its withdrawal liability. The total amount of unpaid instalments, according to recently updated figures provided by NIGPP, is $709,132.38. (Id. ¶¶ 15, 16; July 26, 2013 Update Letter). Black Millwork contends that paying such an amount would drive it out of business. (Hoffman Decl. ¶ 18).

For an employer that is delinquent in making withdrawal liability payments, the NIGPP Plan Document assesses an interest rate of prime plus

---

[6] In a letter dated November 19, 2010, NIGPP informed Black Millwork that it had recalculated the total withdrawal liability to be $5,154,623.00. The quarterly payment amount and the number of payments did not change. (SMF ¶ 14).

4

two percent – 5.25% at the time NIGGP's motion was filed. (Sections 12.06(d) and 10.03(c) of Ex. G to SMF). The employer is also required to pay liquidated damages, consisting of the greater of 20% of the unpaid installments or the total interest owed, plus attorneys' fees and costs. (*Id.*).

C. Procedural History

On September 1, 2011, after Black Millwork had missed a number of quarterly payments, NIGPP filed the present action, alleging that ERISA requires Black Millwork to pay, pending resolution of the parties' arbitration, any interim withdrawal liability payments, plus interest, liquidated damages, and attorneys' fees and costs. NIGPP filed an Amended Complaint on December 8, 2011. Because the claims arise under ERISA, the Court has federal question jurisdiction. *See* 28 U.S.C. § 1391; 29 U.S.C. § 1451(c). Venue is proper because Black Millwork is located and does business in this District. *See* 28 U.S.C. § 1331; 29 U.S.C. § 1451(d).

There were efforts at settlement and mediation, which apparently came to nothing. Thereafter, on September 21, 2012, NIGPP filed this motion for summary judgment.

II. **LEGAL STANDARD**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (summary judgment is appropriate where "there is no genuine issue of material fact to be resolved and the moving party is entitled to judgment as a matter of law."); *Alcoa, Inc. v. U.S.*, 509 F.3d 173, 175 (3d Cir. 2007). Summary judgment is desirable because it eliminates unfounded claims without resort to a costly and lengthy trial, *Celotex*, 477 U.S. at 327, but a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

"[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Celotex*, 477 U.S. at 323. Once the moving

party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 247-48. In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

## III. ANALYSIS

### A. Has Black Millwork's Duty to Make Interim Withdrawal Liability Payments Been Triggered?

NIGPP argues that summary judgment is appropriate because ERISA requires Black Millwork to make interim withdrawal liability payments even while it disputes the fact or the amount of its liability in arbitration. This statutory scheme has been succinctly described as "pay now, dispute later." Black Millwork responds that the Court should apply an equitable exception, developed by the Fifth and Seventh Circuits, which would relieve it from making interim withdrawal liability payments. I find that there are no genuine issues of material fact and that NIGPP is entitled to judgment as a matter of law.

ERISA imposes withdrawal liability on an employer if the employer withdraws from the plan while there remain unfunded, vested benefits. *See* 29 U.S.C. §§ 1381(a), 1383(a). Congress enacted this requirement to ease the financial burden on the pension fund and on the remaining participating employers in a multiemployer plan. *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 (1984). In particular, Congress was concerned that multiemployer pension plans would collapse if withdrawing employers were permitted to, in effect, saddle the remaining employers with their pension liabilities while disputes remained pending. *Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 139 (3d Cir. 1997).

Thus the employer's liability for unfunded, vested benefits is triggered by "withdrawal" from the plan:

> [A "withdrawal" occurs] when the employer either permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations under the plan. 29 U.S.C. § 1383(a). The employer is liable for its share of the plan's

6

> unfunded vested benefits as calculated at the time of withdrawal. 29 U.S.C. §§ 1381, 1383, 1391; *Concrete Pipe & Products v. Construction Laborers Pension Trust*, 508 U.S. 602, 609, 113 S.Ct. 2264, 2272, 124 L.Ed.2d 539 (1993). The plan sponsor has the responsibility of determining this withdrawal liability, notifying the employer and collecting payment. 29 U.S.C. § 1382. If the employer disputes the amount set, it may ask the plan sponsor to conduct a reasonable review of the computed liability. 29 U.S.C. § 1399(b)(2)(A). In the event the dispute is unresolved, either party may request arbitration. 29 U.S.C. § 1401(a)(1). The arbitrator's award, in turn, may be challenged in federal court. 29 U.S.C. § 1401(b)(2).

*Galgay*, 105 F.3d at 138–39.

Under this rigid regime, not many issues of fact are even theoretically material. The ordinary preliminary injunction factors, for example (probability of success, irreparable injury, balance of harms, and the public interest) do not apply. *Id.* at 140. Congress has provided that "withdrawal liability *shall* be payable in accordance with the schedule set forth by the plan sponsor." *Id.* (quoting 29 U.S.C. § 1399(c)(2) and adding emphasis). "[O]nce the pension fund has demonstrated that it complied with the statutory requirements for calculating liability and notifying the employer," this Court's "jurisdiction is limited to ordering the employer to make interim payments." *Id.*

Here, the record is clear that NIGPP has taken the necessary steps under ERISA to impose withdrawal liability on Black Millwork. After Black Millwork notified NIGPP that it was withdrawing from the Plan, the NIGPP Administrative Agency first determined that Black Millwork had incurred withdrawal liability and then calculated the amount due, which was in excess of $5 million. (SMF ¶ 12, Exs. D, E). NIGPP informed Black Millwork of its findings by letter dated July 13, 2010, and demanded payment. (*Id.*). Even if Black Millwork planned to challenge that determination in arbitration, as a matter of law, the steps taken by NIGPP were enough to trigger Black Millwork's duty to make interim payments. *See* 105 F.3d at 141 ("The Fund had sustained its burden of showing that withdrawal liability was assessed, [the employer] was notified and payments were not made. That is all the statute requires.").

When Black Millwork ceased paying the interim withdrawal liability instalments (after making the first payment), it ran afoul of ERISA.

7

## B. Does It Matter That Black Millwork Has Invoked Arbitration?

Black Millwork has commenced arbitration to contest the existence or amount of its withdrawal liability. That it may certainly do; ERISA itself mandates that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved by arbitration." 29 U.S.C. § 1401(a). Because NIGPP's determination of withdrawal liability was made pursuant to section 1382, it falls within the scope of that statutory arbitration provision.

Invocation of arbitration, however, does *not* absolve an employer of its duty to make interim payments. Exactly the opposite: ERISA requires that employers "make these payments even if they elect to arbitrate their liability." *Trs. of Amalgamated Ins. Fund v. Crown Clothing, Inc.*, 27 F. Supp. 2d 507, 512 (D.N.J. 1998). Thus ERISA "directs employers to begin payments upon notification of withdrawal liability, whether or not they choose to dispute the determination." *Galgay*, 105 F.3d at 139. And such payments are to continue during arbitration, "until the arbitrator issues a final decision":

> *Payments shall be made by an employer* in accordance with the determinations made under this part *until the arbitrator issues a final decision* with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination. If the employer fails to make timely payment in accordance with such final decision, the employer shall be treated as being delinquent in the making of a contribution required under the plan.

29 U.S.C. § 1401(d) (emphasis added); *see also* 29 U.S.C. § 1399(c)(2) (employer, prior to making an arbitration demand, may request that the fund review its liability calculation).

In short, the statutory scheme is "pay now, dispute later." "[P]ayments are to be made during arbitration. Should the arbitrator decide that the plan sponsor erred in assessing withdrawal liability, the employer is reimbursed for any overpayment." *Galgay*, 105 F.3d at 139. The pendency of a dispute in arbitration does not affect Black Millwork's obligation to make interim withdrawal liability payments.

8

### C. Do Black Millwork's Factual Contentions or Its Failure to Complete Discovery Bar Liability?

Black Millwork, in a counterstatement filed with its opposition to summary judgment, purports to deny certain facts in NIGPP's Statement of Material Facts. As noted above, Black Millwork does so in conclusory fashion, as if it were answering a complaint, without any citation to the record. *See* p. 2 n.2, *supra*. The Court could deem such facts to be admitted, but it is not necessary to do so. The very few facts needed to establish NIGPP's entitlement to interim payments are not meaningfully contested.

Black Millwork also claims that NIGPP failed to respond to certain discovery requests, and it hypothesizes that proper responses might furnish a basis to claim that there is a genuine issue of material fact. I might construe this as an invocation of Federal Rule of Civil Procedure 56(d) ("When Facts Are Unavailable to the Nonmovant"). That Rule requires the nonmovant to show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to summary judgment. Fed. R. Civ. P. 56(d). Black Millwork has not done so. That in itself would be sufficient to defeat the Company's argument and allow me to resolve the summary judgment motion. *See Falcone v. Columbia Pictures Indus., Inc.*, 805 F.2d 115, 117 n.2 (rejecting Falcone's argument "that the district court erred in entertaining Columbia's motion for summary judgment without affording him the opportunity for discovery" because "Falcone [] failed to comply with the requirements of Fed. R. Civ. P. 56[d] . . . Most courts . . . agree that filing an affidavit thereunder is necessary for the preservation of a contention that summary judgment should be delayed pending further discovery." (internal quotation and citation omitted)). In addition, Magistrate Judge Dickson granted Black Millwork leave to file a motion to compel this discovery, but it declined to do so; instead, it allowed discovery to close. (*See* Docket Nos. 25-27). This is another ground for denying Rule 56(d) relief. *See, e.g., Mobley v. City of Atlantic City Police Dep't*, 89 F. Supp. 2d 533, 537 (D.N.J. 1999) ("courts have routinely denied applications for relief under Rule 56([d]) when the party seeking the delay has failed to take advantage of discovery" (citing 10B Fed. Prac. & Proc. Civ. § 2740 (3d ed.)).

Technicalities aside, however, Black Millwork has not proffered, nor can I discern, any disputed issue of material fact that might emerge from such discovery. The allegedly outstanding discovery requests seek agreements with a

9

"carrier" referred to in the collective bargaining agreement between Black Millwork and the United Auto Workers Union; general financial information about the Plan; an explanation of NIGPP's calculation of the withdrawal liability amount; and prior, recent settlements between NIGPP and withdrawing employers. (*See* Opp. at 7 [Docket No. 35] (listing requests)). Those requests are directed primarily, if not solely, to the *amount* of withdrawal liability, an issue committed to arbitration. Black Millwork does not indicate how the documents it seeks would tend to disprove the basis for NIGPP's very narrow claim in this action.

Black Millwork has not raised any dispute as to the very few facts germane to the case. That is not surprising; the substantive issues are consigned to arbitration, and the Court must consider only whether the simple procedural steps described in ERISA – assessment of liability, a demand on the employer, and the employer's refusal – have been completed. They have.

D. Does an Equitable Exception Apply?

I consider one final issue: whether an equitable exception to the mandate of ERISA would justify withholding interim withdrawal liability payments. Black Millwork points out that the Fifth and Seventh Circuits have invoked equity to excuse interim payments "where the employer can show that it would suffer severe financial hardship, and that the pension fund's claim is frivolous or not colorable." *Galgay*, 105 F.3d at 140 (citing *Trustees of Plumbers and Pipefitters Nat'l Pension Fund v. Mar-Len, Inc.*, 30 F.3d 621, 626 (5th Cir. 1994); *Trustees of the Chicago Truck Drivers Pension Fund v. Rentar Indus., Inc.*, 951 F.2d 152, 155 (7th Cir. 1991)). Those two Circuits "have adopted the equitable exception solely to ensure that the courts are not used by an unscrupulous pension fund lacking a legitimate withdrawal liability claim to squeeze money from an employer and propel it into bankruptcy." *Galgay*, 105 F.3d at 141.

Whether such an equitable exception exists is not settled in the Third Circuit. *Galgay*, 105 F.3d at 141 ("We do not now have occasion to consider adopting a similar equitable exception."). Certain language in *Galgay* might suggest that our Court of Appeals is skeptical. *See id.* at 140 ("We have never held that there are any equitable exceptions to the statutory provisions on interim payments and we decline to do so now. Congress has clearly indicated its intent in this matter. The plain language of the statute . . . provides no exceptions") (citation omitted). *See also Eusa-Allied Acquisition Corp. v. Teamsters Pension Trust Fund of Philadelphia & Vicinity*, Civ. No. 11-3181, 2011 WL 2457695, at *5 (D.N.J. June 16, 2011) (Simandle, C.J.) ("[W]hile such

10

an exception is not explicitly prohibited by [*Galgay*], it is certainly not approved either.").

One thing, however, is clear: The Third Circuit is not prepared to go beyond those Fifth and Seventh Circuit holdings.[7] To the extent such an equitable exception is available at all, the party invoking it must demonstrate *both* (a) that the fund's claim in arbitration is frivolous *and* (b) that interim payments would inflict irreparable harm. *Galgay* explicitly "agree[d] with the reasoning employed by the Fifth and Seventh circuits in concluding that a showing of irreparable harm to the employer is alone insufficient to warrant equitable relief from interim payment liability." *Id.* at 141. *See also Eusa-Allied, supra* (*Galgay* "expressed limited agreement with the Fifth and Seventh Circuit courts on the issue that irreparable harm *alone* is insufficient to warrant equitable relief from interim payment liability. However, the [*Galgay*] majority opinion concluded that, because the employer had not raised the argument that the fund's claim was frivolous, it would not consider the issue." (internal quotation omitted)).[8]

But if the equitable exception were available, NIGPP would still be entitled to judgment as a matter of law. Even if Black Millwork could demonstrate irreparable harm, under *Galgay* that would not be enough. Black Millwork could not, as it must, make the additional required showing that NIGPP's underlying withdrawal liability claim is frivolous or not colorable. *Galgay*, 105 F.3d at 140-41 (citing *Mar-Len*, 30 F.3d at 626; *Rentar*, 951 F.3d at 155).

---

[7] I note that "at least one other circuit, the First Circuit, has erected even more stringent requirements around staying interim withdrawal liability payments." *Eusa-Allied*, 2011 WL at *5 (citing *Giroux Bros. Transp., Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 73 F.3d 1, 5 (1st Cir. 1996) (requiring employer to show threat of imminent liquidation)).

[8] In addition, the procedural posture of this case, a motion for summary judgment, differs from that of the cited Court of Appeals cases. The equitable exception arose from the irreparable injury requirement for a preliminary injunction. *See Robbins v. McNicholas Transp. Co.*, 819 F.3d 682, 685-86 (7th Cir. 1987) ("Upon considering the employer's probability of success before the arbitrator, and the gravity of any economic hardship caused by payment of installments while awaiting decision, the court should have discretion, similar to that exercised in deciding whether to issue a preliminary injunction, to decline to use its injunctive power to compel payment."); *Mar-Len*, 30 F.3d at 623 (adopting the *McNicholas* standard in reviewing an order compelling interim payments).

11

The frivolousness prong "has been applied rarely" and "'is at most a recognition that if the fund's claim is frivolous—if the arbitrator is almost certain to rule for the employer—then the plan is engaged in a ploy that a court may defeat.'" *Eusa-Allied*, 2011 WL at *6 (quoting *Trs. of the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Central Transp., Inc.*, 935 F.3d 114, 119 (7th Cir. 1991)). "The only examples of sufficiently 'frivolous' claims under these circuits found by the Court are cases where the fund seeks to extract withdrawal liability in explicit conflict with the provisions of MPPAA itself." *Eusa-Allied*, 2011 WL at *6 (citing *Robbins*, 819 F.2d 682 (finding fund's assessment of withdrawal liability against employer that ceased making contributions during labor dispute, despite explicit "labor dispute" exception to liability under MPPAA, 29 U.S.C. § 1398(2)). Viewing the standard from the positive side, "[a] claim is colorable if it is more likely than not to have some merit." *Mar-Len*, 30 F.3d at 626; *Crown Clothing*, 27 F. Supp. 2d at 514.

Black Millwork does not seriously attempt to show that NIGPP's claim is so meritless as to be frivolous. And indeed NIGPP's claim seems to stand on solid contractual and statutory ground: The Plan is governed by ERISA, Black Millwork agreed in the Participation Agreement to contribute to the Plan, and the Company's unilateral withdrawal appears facially to trigger liability under ERISA and the Plan's underlying documents. In *Crown Clothing*, for example, the court found that the fund's withdrawal liability claim was not frivolous even where the employer articulated a plausible factual defense to liability. (The employer claimed that the fund had engineered its withdrawal in order to pressure it into accepting a collective bargaining agreement.) No such defense is proffered here. In short, NIGPP's claim does not strike me as one on which the arbitrator is almost certain to rule in the employer's favor.

I need not look to the other prong – irreparable harm to the employer – because "the Third Circuit [has] rejected the possibility that the threat of irreparable harm to an employer [is] alone sufficient to warrant equitable relief from interim withdrawal liability payments." *Crown Clothing*, 27 F. Supp. 2d at 515 (citing *Galgay*, 105 F.3d at 141). Specifically, the Third Circuit has stated that:

> a showing of irreparable harm to the employer is alone insufficient to warrant equitable relief from interim payment liability. In both instances, [the Fifth and Seventh Circuits] have recognized that withdrawing employers are often financially troubled companies.

*Mar-Len*, 30 F.3d at 626; *Central Transport*, 935 F.2d at 118-19. If such companies are allowed to defer paying their debt to the pension funds, and go out of business while liability is being litigated, the pension funds will be saddled with full liability for the unfunded pension benefits. The interim payment provisions are designed to diminish this risk. *Mar-Len* 30 F.3d at 626; *Central Transport* 935 F.2d at 118.

> We believe that it would contort the law if we were to allow the undercapitalized or financially precarious companies that pose the very risk to pension funds that MPPAA was designed to correct to defer payment because they pose that risk. It is inappropriate to refuse a preliminary injunction ordering interim withdrawal liability payments on the grounds that the payments might pose a financial risk to the employer.

*Galgay*, 105 F.3d at 141.

I understand that Black Millwork has suffered business reverses and is in financial difficulty. Under the law, however, it cannot extricate itself from its predicament by ceasing to pay its pension obligations. Nor is it free under the law to allocate the burden of its financial problems to its pension-eligible workers or the other participants in this multiemployer plan. In short, ERISA leaves me no choice; I could not, if I wished, relieve Black Millwork from its ERISA obligations solely because of financial hardship, however severe.[9] *See Crown Clothing*, 27 F. Supp. 2d at 515; *see also Eusa-Allied*, 2011 WL at *6 (finding fund's claim not frivolous without analyzing irreparable harm).

Accordingly, NIGPP's motion for summary judgment is granted.

---

[9] Of course an employer at risk of bankruptcy and employees at risk of losing their vested pension benefits might see the benefit of coming to an accommodation. That is a different matter.

13

## IV. CONCLUSION

For the reasons stated above, NIGPP's Motion for Summary Judgment is **GRANTED**. An appropriate order follows. NIGPP is directed to submit, in appropriate form, a calculation of the withdrawal liability payments currently due, including interest, as well as liquidated damages consisting of the greater of 20% of the unpaid installments or the total interest owed, plus attorneys' fees and costs. (Sections 12.06(d) and 10.03(c) of Ex. G to SMF). Such figures, if approved, will be incorporated in a final order.

_____
KEVIN MCNULTY
United States District Judge

Dated: August 1, 2013